# United States Court of Appeals
## For the Eleventh Circuit

---

No. 05-11622

---

District Court Docket No.
03-00039-CR-FTM-29-DNF

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

May 16, 2007

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

versus

ARTEMUS E. WARD, JR.,

      Defendant-Appellant.



A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

--------------------------------------------------------------
Appeal from the United States District Court
for the Middle District of Florida
--------------------------------------------------------------

### J U D G M E N T

    It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:    May 16, 2007
For the Court:    Thomas K. Kahn, Clerk
By:    Jackson, Jarvis

ISSUED AS MANDATE
JUN 1 4 2007
U.S. COURT OF APPEALS
ATLANTA, GA.

2007 JUN 18  AM 10: 47
U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

FILED

# CORRECTED

U.S. v. WARD

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 1 6 2007
THOMAS K. KAHN
CLERK

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Artemus E. WARD, Jr., Defendant–
Appellant.**

No. 05–11622.

United States Court of Appeals,
Eleventh Circuit.

May 16, 2007.

**Background:** Defendant was convicted in the United States District Court for the Middle District of Florida, No. 03-00039-CR-FTM-29-DNF, John E. Steele, J., of mail and wire fraud, and he appealed.

**Holdings:** The Court of Appeals, Marcus, Circuit Judge, held that:

(1) evidence was sufficient to support defendant's mail and wire fraud convictions, and

(2) court did not constructively amend indictment by instructing the jury that it could convict defendant on the mail and wire fraud charges even if it could not reach a verdict on conspiracy charge.

Affirmed.

**1. Postal Service ⇐35(2)**

**Telecommunications ⇐1014(2)**

Aside from the means by which a fraud is effectuated, the elements of mail fraud and wire fraud are identical; offenses require that a person (1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or "causes" the use of the mails or wires for the purpose of executing the scheme or artifice. 18 U.S.C.A. §§ 1341, 1343.

**2. Postal Service ⇐35(11.1)**

**Telecommunications ⇐1014(1)**

Mail or wire fraud element that scheme or artifice to defraud involves the making of misrepresentations intended and reasonably calculated to deceive persons of ordinary prudence and comprehension. 18 U.S.C.A. §§ 1341, 1343.

**3. Postal Service ⇐35(6)**

**Telecommunications ⇐1014(4)**

A person "causes" the mails to be used within the meaning of mail fraud statute, or the wires to be used within the meaning of wire fraud statute, when he acts with knowledge that the use of the mails or wires will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended. 18 U.S.C.A. §§ 1341, 1343.

See publication Words and Phrases for other judicial constructions and definitions.

**4. Postal Service ⇐35(20)**

A defendant may be convicted of mail fraud without personally committing each and every element of mail fraud, so long as the defendant knowingly and willfully joined the criminal scheme, and a co-schemer used the mails for the purpose of executing the scheme; so long as one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails. 18 U.S.C.A. § 1341.

**5. Criminal Law ⇐878(4)**

Fact that mistrial was granted on conspiracy count did not preclude defendant's

Synopsis, Headnotes and Key Number Classification
COPYRIGHT © 2007 Thomson/West

The Synopsis, Headnotes and Key Number Classification constitute no part of the opinion of the court.

2121

U.S. v. WARD

convictions on mail and wire fraud counts based on a co-participant's use of the mails or a wire transfer. 18 U.S.C.A. §§ 1341, 1343.

**6. Postal Service ⚖=35(14)**

**Telecommunications ⚖=1014(9)**

Evidence was sufficient to support defendant's mail and wire fraud convictions based on his knowing participation in a complex, fraudulent Ponzi scheme, whereby millions of dollars in investor funds were obtained by making false representations that the investments would be used to make loans to used car dealers, that the investors would be paid high rates of interest, and that the loans would be fully insured by liens on the dealers' inventories of used cars; evidence established that defendant knowingly and intentionally participated for an extended period in a false and fraudulent scheme, and that defendant or a co-participant caused the use of the mails and wire transfers in furtherance of the scheme. 18 U.S.C.A. §§ 1341, 1343.

**7. Indictment and Information ⚖=171**

A defendant can only be convicted for a crime charged in the indictment. U.S.C.A. Const.Amend. 5.

**8. Indictment and Information ⚖=159(1)**

An indictment is "constructively amended" in violation of due process when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment. U.S.C.A. Const. Amend. 5.

See publication Words and Phrases for other judicial constructions and definitions.

* Honorable Cecilia M. Altonaga, United States District Judge for the Southern District of Florida, sitting by designation.

1. "The term 'Ponzi scheme' is derived from Charles Ponzi, a famous Boston swindler ....

**9. Criminal Law ⚖=1167(1, 4)**

Whereas a variance between indictment and proof requires reversal only when the defendant can establish that his rights were substantially prejudiced, constructive amendment of the indictment is *per se* reversible error. U.S.C.A. Const.Amend. 5.

**10. Indictment and Information ⚖=159(2)**

District court did not constructively amend indictment by instructing the jury that it could convict defendant on the mail and wire fraud charges even if it could not reach a verdict on conspiracy charge. U.S.C.A. Const.Amend. 5.

**11. Indictment and Information ⚖=119**

Surplusage in an indictment may be deleted without any legal error.

——————

Appeal from the United States District Court for the Middle District of Florida.

Before ANDERSON and MARCUS, Circuit Judges, and ALTONAGA,* District Judge.

MARCUS, Circuit Judge:

Artemus E. Ward, Jr. ("Ward") appeals his conviction after jury trial and his ensuing sixty-month prison sentence for mail and wire fraud. The charges arose out of Ward's involvement in a complex, fraudulent Ponzi scheme,[1] whereby millions of dollars in inves-

Generically, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *United States v. Silvestri*, 409

tor funds were obtained by making false representations that the investments would be used to make loans to used car dealers, that the investors would be paid high rates of interest, and that the loans would be fully insured by liens on the dealers' inventories of used cars. Ward claims on appeal that his conviction should be reversed and his sentence vacated, first, because the evidence did not sufficiently establish that he actually caused the mailings and wire transfers charged in the substantive counts of the indictment, and, second, because the district court "constructively amended" the indictment by instructing the jury that it could convict on the substantive offenses even if it could not reach a verdict on the conspiracy charge. Finally, Ward challenges his sentence as violating the Ex Post Facto Clause of the Constitution. After thorough review, we affirm.

I.

In March 2004, a grand jury charged Artemus Ward, Jr., and his partner, Jeffrey Pipher ("Pipher"), in a second superseding indictment with conspiracy, mail fraud, and wire fraud. Specifically, Ward and Pipher were charged in Count One with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371 for soliciting investor funds through fraudulent representations about how these funds would be used to finance loans to automotive dealerships. Count Two charged Ward and Pipher with mail fraud in violation of 18 U.S.C. §§ 1341 and 2 for obtaining investor funds under false pretenses by mailing or causing to be mailed a collateralized promissory note in September 2000 to an investor named Richard Rabenstein. Count Three charged Ward and Pi-

pher with wire fraud in violation of 18 U.S.C. §§ 1343 and 2 for obtaining investor funds under false pretenses when investors Ellen and Randy Johns wired funds from their bank account to Ward and Pipher on April 24, 2000. Finally, Count Four charged Ward with a second mail fraud count in violation of 18 U.S.C. §§ 1341 and 2 for obtaining investor funds under false pretenses by mailing investment documents to an investor named Larry Baldwin on January 7, 2002.

Before trial, Pipher pled guilty to Counts One, Two, and Three pursuant to a written plea agreement and became a witness for the government, leaving Ward to stand trial alone. After a week-long trial, the jury was not able to reach a verdict as to the conspiracy charge,[2] but found Ward guilty of both mail fraud counts and the wire fraud charge too.

Viewing the evidence in the light most favorable to the jury verdict, the essential facts adduced at trial are these. In 1999, Pipher and the defendant Ward incorporated the Collateral Equities Corporation ("CEC") in Nevada and designated themselves as president and general manager, respectively. CEC's ostensible business objective was to solicit potential investors to invest in collateralized corporate notes, or promissory notes. The investors were told that their principal would be invested in the "auto floor planning business," which involved lending car dealerships the funds to purchase inventory. The titles to the cars were held as collateral, and as each car was sold, the dealer was required to repay a portion of the loan. Eventually, the lender would return the title to the dealer. Through advertisements placed in the Investor's Business Daily paper, the USA

F.3d 1311, 1317 n. 6 (11th Cir.2005) (internal citations and quotation marks omitted).

2. The government eventually dismissed the conspiracy count lodged against Ward on November 29, 2004.

2123

U.S. v. WARD

Today newspaper, and a few local California papers, and through a telemarketing "boiler room" operation named One Trade, Ward and Pipher enticed many investors to part with their money.

Ward and Pipher promised would-be investors annual returns of between 28% and 50% with maturity dates varying from 6 to 24 months. In theory, this business proposition offered investors a spectacular deal—a high rate of return on investments with a low risk that the investments would go awry because the loans were fully secured by collateral. From its inception, however, this business scheme was fraught with deception.

In establishing the initial information packets, promissory notes, and investor contracts for CEC, Pipher took various documents without permission from his job with another automobile floor planning operation, Secured Assets Incorporated ("SAI"), and with Ward's assistance, copied these documents to create CEC's basic documents. Moreover, the introductory letter to the information packet, which both Ward and Pipher signed, falsely represented that CEC had been in business for some three-and-a-half years when, in reality, the company had just been formed.

Overall, some ninety to one hundred investors, contributing approximately $5 million in total to Ward and Pipher, were victimized by the fraudulent scheme. At the time of trial, about $3.2 million in investor funds remained unaccounted for and only about $90,000 had actually been loaned to any car dealership. Although Pipher and Ward gave investors a list of seventeen car dealerships with which they claimed they were doing business, Ward and Pipher actually conducted business with only two dealerships and one self-employed car wholesaler. Some of the CEC documents also falsely claimed that CEC was

holding title to cars valued at $900,000. Ward also used some of the money to gamble, and Pipher used some of it to make other personal investments. In fact, most of the investors' money was spent by Pipher and Ward for their personal use and to make interest payments, albeit only to the initial investors. At trial, Ward testified that "in all but a handful of instances, I was the one who had talked the people into joining the company in the first place and knew where the money went, whether it was to [Pipher's] account or my account or the account in Monterey."

Because Ward claims that the evidence was insufficient as to each of the substantive mail and wire fraud counts, we group the evidence for convenience by count.

A. *Count Two: Mail Fraud Against Richard Rabenstein*

Count Two, the first mail fraud count, charged in the operative paragraph that:

In or about September, 2000, in the Middle District of Florida and elsewhere, the defendants, Artemus E. Ward, Jr., and Jeffrey Pipher, for the purpose of executing the aforementioned conspiracy to defraud, and for obtaining money and property by means of false pretenses, representations and promises, did knowingly mail and cause to be mailed a matter to be delivered by the United States Postal Service, a collateralized CEC promissory note to Richard Rabenstein, who had invested approximately $155,000 with the defendants. All in violation of Title 18, United States Code, Sections 1341 and 2.

The central document alleged in Count Two of the indictment—a promissory note mailed to victim Richard Rabenstein and dated September 1, 2000—was signed only by Pipher and not Ward. *See* Gov. Ex. 4. The note

*INSERT COMMAS IN BRACKETS [,]*

said that CEC "promise[d] to pay ... monthly interest payments on the principal sum of One Hundred Fifty Five Thousand Dollars ($155,000) at the rate of three and one half percent (3.5%) per month, which calculates to a rate of Forty two percent (42%), per annum." *Id.* At trial, the government produced ample evidence establishing that, although Ward was not responsible for actually mailing the promissory note listed in Count Two, he was substantially involved in a variety of other mailings and transactions with Richard Rabenstein, all designed to further the fraudulent scheme.

Richard Rabenstein's ill-fated business venture with CEC and Ward began when he responded in June 1999 to CEC's classified advertisement posted in the Investor's Business Daily. He called the number listed in the ad and spoke with Pipher, who soon thereafter mailed him a brochure signed by both Ward and Pipher. *See* Gov. Ex. 2. The introductory letter to the brochure, dated July 15, 1999, falsely represented that, "For the past three and half years we have been involved in a very lucrative business in a burgeoning industry." *Id.* The letter promised "the very high return of 42% on your loan dollars with a minimum $10,000 investment." *Id.* Indeed, the CEC Executive Summary, attached to the introductory letter, falsely said that "[c]urrently CEC is servicing twelve dealers in greater San Diego and an additional two in the Los Angeles area—the limit of our current capitalization of approximately $400k." *Id.* The back page of the packet, marked "Company Confidential," falsely listed seventeen car dealerships in San Diego County, ten of which had a dollar amount in the column titled "Note Balance]." *Id.* To assuage any doubts about CEC's legitimacy, Rabenstein was also provided with three references of ostensibly satisfied investors.

Additionally, on July 27, 1999, Ward sent Rabenstein a handwritten letter of invitation, bearing Ward's signature, to make an initial investment. Ward's handwritten letter on CEC stationery read in part: "For your convenience I've enclosed a pre-paid return express-mail envelope. Because of the high interest we are paying it is important to place your funds with dealers ASAP. As such, you have 3 payment options: A) personal check, B) bank, or cashier's check, C) bank wire." Gov. Ex. 63. Rabenstein then used the enclosed prepaid U.S. Postal Service envelope to make his first investment of $25,000 by endorsing a personal check made payable to Pipher. In return, Rabenstein received an investor agreement signed again both by Ward and Pipher.

Rabenstein acknowledged that for the first few months after he invested with CEC, the interest payments would arrive on time each month. He then made an additional $70,000 investment with a check made payable to both Ward and Pipher. Rabenstein's investment, including promised interest payments that were rolled over into his principal investment but never paid, ultimately totaled $155,000.

The promissory note specified in Count Two (dated September 1, 2000) reflects the total amount that Rabenstein had invested. In a subsequent letter mailed to Rabenstein, dated November 25, 2000, this time signed by both Ward and Pipher, CEC explained how rolling interest payments would work. *See* Gov. Ex. 65. In March 2002, Ward called Rabenstein to tell him there would be an investor meeting in California to assure worried investors that they would be paid their interest and repaid their principal. According to Rabenstein's testimony, Ward said that all of the funds were intact. Around this time, Rabenstein noticed an advertise-

*Delete COMMA, MAKE "FOR → [f]OR LOWER CASE W/ BRACKETS*

2125

*Add APOSTROPHE:*
*INVESTOR'S*

U.S. v. WARD

ment in the classified section of Investors
Business Daily, dated March 11, 2002. The
ad promised "guaranteed residual income for
life, 3–4% of investment paid monthly. 5 year
track record." Rabenstein spoke with Ward
about the new advertisements and Ward ad-
mitted that he had placed the ads and told
Rabenstein that CEC was a fully operational,
ongoing business. After Rabenstein began
receiving numerous checks that bounced and
noticing that missed payments were recur-
ring, he contacted FBI Agent Michael De-
Leon in March 2002 to complain about the
conduct of CEC and its principals.

**B.** *Count Three: Wire Fraud Against El-
len and Randy Johns*

Count Three, the wire fraud count,
charged in the operative paragraph that:

On or about April 24, 2000, in the Middle
District of Florida and elsewhere, the de-
fendants, Artemus E. Ward, Jr., and Jef-
frey Pipher, for the purpose of executing
the aforementioned conspiracy to defraud,
and for obtaining money and property by
means of false pretenses, representations
and promises, did knowingly transmit and
cause to be transmitted by means of wire
communication in interstate commerce
from Charlotte Harbor, Florida, to Del
Mar, California, certain writings, signs,
signals, and sounds, namely, a wire trans-
fer of $45,000 from a South Trust Bank
account in the name of Ellen R. Johns and
Randy Johns, to a Union Bank of Califor-
nia account in the name of Collateral Equi-
ties Corporation. All in violation of Title
18, United States Code, Sections 1343 and
2.

Just like Richard Rabenstein, Randy Johns
first learned about CEC from a newspaper
advertisement in 1999. Johns called the
number listed in the advertisement and

spoke with the defendant Ward, who prom-
ised him, too, that his investments in CEC
would yield an annual interest rate of 45% or
a monthly interest rate of 3.75%. Johns
spoke with Ward a few more times over the
telephone before flying to California to meet
with Ward and Pipher. During this trip,
Ward and Pipher took Johns on a tour of one
dealership and pointed to three others to
which Ward said CEC had loaned money.
Sufficiently satisfied after the trip about the
prospect of investing with CEC, Johns exe-
cuted a promissory note with Ward for some
$75,000. He sent a check by mail to Sylvia
Maguire, a third party who provided a bond
for his investment. Over the next year, Ran-
dy Johns and his wife Ellen Johns made four
additional investments into the scheme in the
amounts of $60,000, $28,000, $10,000, and fi-
nally $45,000.

For the Johnses' final investment, which is
the subject of Count Three, Ellen Johns sent
$45,000 by wire transfer on April 24, 2000,
from her bank, South Trust Bank in Char-
lotte Harbor, Florida, to Union Bank of Cali-
fornia in Del Mar, California. *See* Gov. Ex.
6. After October 2001, CEC stopped send-
ing interest payments. Although Mrs. Johns
attempted to contact Ward about this, she
received no response.

**C.** *Count Four: Mail Fraud Against Larry
Baldwin*

Finally, Count Four, the second mail fraud
count, charged in the operative paragraph
that:

On or about January 7, 2002, in the Middle
District of Florida and elsewhere, the de-
fendant, Artemus E. Ward, Jr., for the
purposes of executing the aforementioned
conspiracy to defraud, and for obtaining
money and property by means of false
pretenses, representations and promises,

did knowingly mail and cause to be mailed a matter to be delivered by a private or commercial interstate carrier, Federal Express, CEC investment documents, to Larry Baldwin, in Sarasota, Florida.  All in violation of Title 18, United States Code, Sections 1341 and 2.

The fourth victim, Larry Baldwin, heard about CEC in the spring of 1999 when he saw advertisements placed by CEC in the Investor's Business Daily and the Wall Street Journal business section.  Baldwin called the number listed in the ads and spoke with the defendant Ward.  During this telephone conversation, Ward falsely claimed that CEC had been in business for more than three years.  Ward promised Baldwin an annual rate of return of 48% on a loan if he invested at least $10,000 right away, instead of the 42% return that some other investors were offered.  Additionally, Ward offered Baldwin a finder's fee of approximately $2,000 to $3,000 for each additional investor that Baldwin brought in.  After the conversation, Ward sent Baldwin by Federal Express a CEC brochure containing a cover letter that again falsely claimed CEC had been in existence for three-and-a-half years. The cover letter, dated September 25, 1999, was again signed both by Pipher and Ward. See Gov. Ex. 15.  The letter also contained a handwritten addition by Ward, which read: "An equitable deal for 'finder's fee' considerations—Art [Ward]." Id.

Baldwin called Rabenstein and Johns, whose names were provided as references, and at the time both told Baldwin that they were satisfied with their investments.  Baldwin then decided to invest in December 1999 and contacted Ward to advise him.  Baldwin's first investment of $50,000 in cash initially was supposed to be picked up by Ward or Pipher, but eventually, after assurances from Pipher, was picked up by a third party.

Baldwin was given a receipt for his $50,000 investment, dated March 1, 2000.  See Gov. Ex. 12.  Although the signatures on the receipt bore the names of both Ward and Pipher, Baldwin testified that, based on his handwriting expertise as a "historian," both signatures appeared identical, and that it appeared to him that Pipher had signed both names.

Baldwin made a second investment of $48,000 (which included a "rebate" of $2000, so that the principal investment actually was $50,000) by sending a cashier's check on March 31, 2000.  See Gov. Ex. 13.  Baldwin received a collateralized promissory note for his second investment on April 1, 2000.  This receipt contained the notarized signatures of both Ward and Pipher, and therefore, unlike the first, there was no question about the authenticity of Ward's signature.

Sometime around December 2001, Baldwin contacted Ward on behalf of his cousin, Joseph Blus, who had expressed some interest in investing in CEC.  His cousin had $30,000 in cash, which he wanted Baldwin to invest with CEC on his behalf.  Ward suggested that Baldwin could send his cousin's $30,000 cash investment by Federal Express.  Sensing Baldwin's concern over sending by mail so large an amount of cash, Ward promised that if anything happened to the cousin's money in transit that he would "make good on it.  You know us.  There's no problem." Soon after the telephone conversation with Ward, Baldwin received by Federal Express a contract reflecting the anticipated $30,000 investment.  This collateralized promissory note, dated December 15, 2001, contained Ward's and Pipher's signatures.  See Gov. Ex. 9.

After the FBI commenced an investigation into the affairs of CEC, Ward, and Pipher, Ward admitted in an interview with special

2127

U.S. v. WARD

agents of the FBI that he was responsible for sending the "CEC investment document" on January 7, 2002, which is the subject of Count Four. Ward said: "In furtherance of the continuing efforts to raise capital for CEC, the attached airbill dated 7 January, 2002, was used to send a client/lender contract/agreement for the purpose of receipting [sic] funds to be used to pay other investors. At the time I sent this I knew investors' funds would not be utilized as promised." Gov. Ex. 21. Though the "client/lender contract/agreement" was not included in any government exhibit, the Federal Express air bill, showing that Ward sent a package to Baldwin on January 7, 2002, was admitted in evidence. *See id.*

Baldwin decided it was too risky to send his cousin's investment in the form of cash. Since his cousin did not have his own checking account, Baldwin took his cousin's funds, went to a Bank of America branch, and drew a $9,000 cashier's check. Having considerable doubts about the efficacy of a CEC investment because of the recent history of late interest payments, Baldwin advised his cousin not to invest. His cousin left the decision of whether to invest his money to the discretion of Baldwin. Deciding that it would not be prudent to invest his cousin's money in CEC, Baldwin sought to convert the check back into cash for his cousin. Bank of America told Baldwin that it would be a thirty-day wait to get the money back in cash for the cashier's check. Baldwin discussed this with Ward, and Ward advised him to send the $9,000 cashier's check to CEC. Ward told Baldwin that CEC would not invest the $9,000, but rather deposit the cashier's check in their account and return the cousin's money in cash. Ward gave Baldwin CEC's bank routing number and promised Baldwin that he would quickly send back the cash so that

Baldwin's cousin did not have to wait thirty days.

Somehow convinced of the sincerity of Ward's representations, Baldwin agreed and, on January 10, 2002, sent the Bank of America cashier's check, made out to CEC in the amount of $9,000, by Federal Express to Monterey Federal Credit Union, CEC's bank in Pacific Grove, California. *See* Gov. Ex. 11 (Federal Express sender's voucher). But Ward did not send the cash back as he had promised. Baldwin unsuccessfully tried to contact Ward several times and finally spoke with Pipher. Pipher sent Baldwin a letter, dated February 7, 2002, characterizing the transaction as a "mixup with Art [Ward]" and promising to send him his money in the next few days. Gov. Ex. 10. Baldwin never received the money from Pipher either.

At some point during the deliberative process, the jury sent a note to the district court judge, which read: "Judge Steele, to keep you abreast of where we are, the jury is at an impasse regarding the term 'conspiracy.' If we can't come to an agreement on Count One, can we find guilt or innocence on Counts Two, Three and Four?" Over Ward's objection, the district court answered the jury's inquiry this way:

With regard to the specific question, that is, whether if you still cannot reach an agreement as to the conspiracy count you may find guilt or innocence on Counts Two, Three and Four, the answer is yes, with the following qualifications or restrictions. You may find the defendant guilty of Count Two, Three and/or Four without finding him guilty of conspiracy if you unanimously find that the conduct involved there was for the purposes of obtaining money and property by means of false pretenses .... A second limitation or restriction is if you do not find the defendant guilty of the conspiracy, you may not apply

U.S. v. WARD                          2128

the legal principle I gave you at Page 25 of the instructions [vicarious liability under *Pinkerton v. United States*, 328 U.S. 640, 646, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)]. The district court also urged the jury to continue deliberating to reach a verdict on the conspiracy count.

Ultimately, the jury was unable to reach a verdict on the conspiracy charge, but found Ward guilty on each of the substantive mail and wire fraud counts. Thereafter, the district court sentenced Ward to sixty months in prison on each of the substantive counts, to be served concurrently. He was assessed $300, but a fine and restitution were waived. Finally, Ward was sentenced to three years of supervised release. This appeal followed.

## II.

Ward broadly makes two claims: (1) the evidence was insufficient to establish his role (and therefore his guilt) in each of the mailings and the wire fraud enumerated in the three substantive charges; and (2) the district court constructively amended the indictment, and thereby violated the Fifth Amendment, by instructing the jury that it could convict him on mail and wire fraud without also convicting him on the conspiracy charge. Ward also argues that it was constitutionally required that his post-*Booker* sentence be no higher than the maximum sentence provided by the U.S. Sentencing Guidelines, since the guidelines were legally binding on the dates Ward allegedly committed his offenses and went to trial. We are unpersuaded.

The applicable standards of review are by now well-settled. We review *de novo* a district court's denial of a motion for judgment of acquittal, *United States v. Grigsby*, 111 F.3d 806, 833 (11th Cir.1997), and we examine the evidence in a light most favorable to the jury verdict, *United States v. Jernigan*,

341 F.3d 1273, 1278 (11th Cir.2003). Likewise, we review questions of constitutional law *de novo*. *United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir.2004). However, since Ward admittedly did not raise in the district court his constitutional challenge to the application of the United States Sentencing Guidelines, our review is only for plain error. *See United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir.2005). Under plain error review, "[a]n appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation marks and citations omitted).

### A.   *Co-schemer Liability for Mail Fraud*

Ward challenges the sufficiency of the evidence to support all three substantive counts, contending that he cannot be held vicariously liable under a conspiracy theory because of the mistrial as to Count One. He argues that without the conspiracy the evidence supports neither his convictions for causing the particular mailings of Counts Two and Four nor the wire transfer charged in Count Three.

A factual finding will be sufficient to sustain a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). "[A]ll reasonable inferences must be drawn in favor of supporting the jury's verdict."

2129

U.S. v. WARD

*United States v. Sawyer,* 799 F.2d 1494, 1501 (11th Cir.1986) (per curiam) (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).

[1–3] Aside from the means by which a fraud is effectuated, the elements of mail fraud, 18 U.S.C. § 1341,[3] and wire fraud, 18 U.S.C. § 1343,[4] are identical. *See Beck v. Prupis,* 162 F.3d 1090, 1095 & n. 9 (11th Cir.1998). Both offenses require that a person (1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or "causes" the use of the mails or wires for the purpose of executing the scheme or artifice. *United States v. Hewes,* 729 F.2d 1302, 1320 (11th Cir.1984) (mail fraud); *United States v. Hasson,* 333 F.3d 1264, 1270 (11th Cir.2003) (wire fraud). The first element—a scheme or artifice to defraud—"involves the making of misrepresentations intended and reasonably calculated to deceive persons of ordinary prudence and comprehension." *Beck,* 162 F.3d at 1095. As for the second element, a person "causes" the mails to be used within the

meaning of 18 U.S.C. § 1341, or the wires to be used within the meaning of 18 U.S.C. § 1343, when he acts "with knowledge that the use of the mails [or wires] will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

[4] Although Ward concedes that the evidence is more than sufficient to establish his participation generally in the overall scheme to defraud, he says the government did not prove that he caused the specific mailing of the September 2000 promissory note to Rabenstein to support Count Two, the wire transfer of $45,000 on April 24, 2000, from Ellen Johns to Pipher's bank account to support Count Three, nor the mailing of the CEC investment document on January 7, 2002, to Baldwin to support Count Four.

Ward claims that a defendant must either personally commit each element of mail and wire fraud, or at least aid and abet another in

---

3.  18 U.S.C. § 1341 defines mail fraud this way:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier accord-

    ing to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

4.  18 U.S.C. § 1343 defines wire fraud in these terms:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $ 1,000,-000 or imprisoned not more than 30 years, or both.

doing so. It is not enough, he says, that the evidence sufficiently establishes that he knowingly and willfully participated in the fraudulent scheme, and that a co-schemer used the mails or wires for the purpose of executing the scheme. Ward's argument rests upon a flawed understanding of the applicable law.

For nearly as long as mail fraud has been a federal crime, it has been the law in this Circuit, and in the former Fifth Circuit, that a defendant may be convicted of mail fraud without personally committing each and every element of mail fraud,[5] so long as the defendant knowingly and willfully joined the criminal scheme, and a co-schemer used the mails for the purpose of executing the scheme. As far back as 1932, in *Smith v. United States,* 61 F.2d 681 (5th Cir.1932),[6] a panel of the former Fifth Circuit, in construing a forerunner to 18 U.S.C. § 1341, held that "[t]he guilt of the accused who were on trial was not dependent upon either of them taking part in causing the alleged use of the mails, if another accused who was a party to the alleged scheme to defraud ... in pursuance of that scheme and for the purpose of executing it or attempting to do so, knowingly caused the alleged use of the mails." *Id.* at 685. Again in *Belt v. United States,* 73 F.2d 888 (5th Cir.1934), a panel of the former Fifth Circuit wrote:

It may be assumed that Belt did not sign or cause to be mailed any of the letters set out in the indictment; but, since he was a

party to the scheme and to the false representations, it is immaterial that all the letters designed to promote that scheme were signed and mailed by Kelly. A partnership in crime being established against both appellants, the acts of Kelly in furtherance of the common criminal enterprise were in law the acts of Belt also. *Id.* at 889. Still again in *United States v. Bright,* 588 F.2d 504 (5th Cir.1979), a panel of the former Fifth Circuit wrote: "[I]t is not necessary that a defendant actually do any of the mailing so long as there is sufficient evidence to tie him to the fraudulent scheme which involves the use of the mails." *Id.* at 509 (quotation marks omitted).

[5] This principle remains no less valid today. As a panel of this Court noted recently: "It is well settled in this circuit that so long as one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails." *United States v. Munoz,* 430 F.3d 1357, 1369 (11th Cir.) (quoting *United States v. Toney,* 598 F.2d 1349, 1355 (5th Cir.1979)), *cert. denied,* —— U.S. ——, 126 S.Ct. 2305, 164 L.Ed.2d 816 (2006). Indeed, *United States v. Funt,* 896 F.2d 1288 (11th Cir.1990), is exactly on point. Funt was acquitted by a jury of one conspiracy count as well as two counts of mail fraud, but found guilty on two other counts charging him with mail fraud and one count of wire fraud. *Id.* at 1291. A panel of this Court held that

---

**5.** "Because [t]he 'scheme or artifice to defraud' and 'for the purpose of executing' language in the mail and wire fraud statutes are construed identically, we borrow freely from cases construing Section 1341" mail fraud in analyzing wire fraud under Section 1343. *United States v. Evans,* 473 F.3d 1115, 1118 n. 3 (11th Cir.2006) (citation and quotation marks omitted), *petition for cert. filed,* —— U.S —— , —— S.Ct. —— , —— L.Ed.2d —— (U.S. Mar. 30, 2007) (No. 06–1325).

**6.** Fifth Circuit cases decided before October 1, 1981, *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), as well as decisions by a Unit B panel of the former Fifth Circuit, *Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34 (11th Cir.1982), are binding precedent in the Eleventh Circuit.

"[a]cquittal on the conspiracy count ... does not mean that the jury necessarily rejected the government's proof of Funt's involvement in the scheme. To the contrary, the jury's guilty verdict on the mail fraud count belies Funt's assertion." *Id.* at 1293. "Conspiracy and mail fraud are not the same offense, and the fact that Funt was acquitted of conspiracy is not inconsistent with his being a member of a more limited mail fraud scheme." *Id.* at 1294 n. 4. The principle applies *a fortiori* in this case where the jury found Ward guilty of mail and wire fraud, but simply could not reach a verdict on the conspiracy count. Just as in *Funt*, the jury in this case necessarily found that Ward was involved in the fraudulent scheme, even though it could not reach a verdict on the conspiracy count.

Further, just as in the present case, the defendant in *Funt* claimed that his lack of involvement in causing a *specific* mailing necessitated a reversal of his mail fraud conviction: "Funt argues that he had no actual knowledge of the Howard letter, did not receive it and did not cause it to be sent, and that he was totally disassociated from the Palm Beach franchise." *Id.* at 1294. Again, we flatly rejected the claim—"the law is clear that one need not personally mail or receive mail in order to be liable under mail fraud so long as co-schemers do so." *Id.*[7]

## B. *Defendant's Knowing Participation in the Fraudulent Scheme*

[6] The government presented more than enough evidence to establish beyond a reasonable doubt that the defendant knowingly and intentionally participated for an extended period in a false and fraudulent scheme to induce many unwitting investors to invest millions of dollars in CEC. The record amply shows that from the very first investor CEC solicited, Ward well knew he was engaging in deceitful and fraudulent practices designed to bilk investors.

7. As best we can tell, our Court has never deviated from the principle that if one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails. *See, e.g., Munoz,* 430 F.3d at 1369; *Funt,* 896 F.2d at 1294; *United States v. Dynalectric Co.,* 859 F.2d 1559, 1578 (11th Cir.1988); *United States v. Plotke,* 725 F.2d 1303, 1307 (11th Cir.1984); *United States v. Johnson,* 700 F.2d 699, 701 (11th Cir.1983) (per curiam); *United States v. Martino,* 648 F.2d 367, 394 (5th Cir. June 1981); *United States v. Rodgers,* 624 F.2d 1303, 1308–09 (5th Cir.1980); *Toney,* 598 F.2d at 1355; *Bright,* 588 F.2d at 509; *Weiss v. United States,* 120 F.2d 472, 475 (5th Cir.1941); *Belt,* 73 F.2d at 889; *Smith,* 61 F.2d at 685. In an early mail fraud case, the Supreme Court observed that "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *see also United States v. Ross,* 131 F.3d 970, 985 (11th Cir.1997) (quoting *Pereira,* 347 U.S. at 8–9, 74 S.Ct. 358, and applying it to wire fraud). Since *Pereira,* we have repeated in binding precedent that as long as "one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails." *Toney,* 598 F.2d at 1355; *see also Funt,* 896 F.2d at 1294. In some of our wire fraud cases, however, we have required that the use of the wires be a foreseeable consequence of the fraudulent scheme. *See United States v. Hewes,* 729 F.2d 1302, 1324 (11th Cir.1984) (cited in *Funt,* 896 F.2d at 1294); *United States v. Snyder,* 505 F.2d 595, 601 (5th Cir.1974). At all events, the evidence in this case amply established that the mails and the wires were used repeatedly in the course of CEC's business both by the defendant and Pipher, and that the use of these instruments was wholly foreseeable to each of the participants in the fraudulent scheme. *See infra* at 2132–34. Moreover, the evidence sufficiently established that the defendant Ward acted as a *principal* who actually caused the wire transfer enumerated in Count Three and the mail used in Count Four. *See id.*

Ward knew that CEC was formed in 1999 and yet he helped create and signed his name to CEC brochures in 1999 claiming that CEC had been an ongoing business for some three-and-a-half years. Ward also knew that the CEC brochures and documents he helped create were based on documents that Pipher had taken from his previous employer, as Ward confessed:

> The technical documents of our CEC brochure, e.g, "investor agreement," "dealer agreement" (between CEC and car dealers) were copies, almost verbatim by Jeffrey Pipher from the firm he previously worked for that did "auto flooring" in the San Diego area. He told me that this firm had paid $25,000 dollars for making these agreements legally acceptable and not in violation of any securities laws, etc. However, as time went by (a few months) and feedback came from clients, especially that we were a "Nevada" corporation, I realized these documents were not entirely legal and were therefore risky to continue using, I knowingly and willingly continued to use these documents, with minor variations.

Gov. Ex. 21.

Moreover, the jury plainly was entitled to reject his testimony and consider it as substantive evidence of his guilt. *United States v. Vazquez*, 53 F.3d 1216, 1225-26 (11th Cir. 1995); *United States v. Brown*, 53 F.3d 312, 314 (11th Cir.1995). Indeed, by his own admission Ward knew no later than November 2001 that the money was not being invested as promised and that the scheme created was a Ponzi scheme. Ward signed a damning statement for FBI Agent Michael DeLeon on April 30, 2002. He wrote:

> In the late autumn of 2001, due to a variety of factors, I became gravely concerned that no new monies being raised were being placed with dealers. On November 15, during dinner at Jeffrey Pipher's home I

confronted him about this and he insisted he could do "better at real estate." In spite of this statement on his part, I continued to help raise substantive new capital for CEC, knowing very little would be going to car dealers, just as I had continued to do with the illegal agreements.

Gov. Ex. 21.

Ward further admitted in his written statement to Agent DeLeon that he directly used the mails in furtherance of the scheme:

> I, Artemus E. Ward do state that Amy Beth Davis [Ward's girlfriend at the time] was acting solely on my instructions as manager of CEC in all instances of initiating bankwires or getting cashier's checks. I utilized U.S. Postal Service and other couriers as part of the normal business operations of CEC that I later realized represented a scheme/fraud, and continued.

*Id.*

Thus, contrary to Ward's self-portrayal at trial as a hapless employee of Pipher's, the evidence elaborately paints Ward as being deeply enmeshed in CEC's fraudulent business.

## C. *Sufficiency—Count Two*

As for his conviction on Count Two, which, again, alleged that Ward "did knowingly mail and cause to be mailed a matter to be delivered by the United States Postal Service, a collateralized CEC promissory note to Richard Rabenstein" in September 2000, the government acknowledges that Ward did not write, sign, or cause the mailing of the promissory note to Rabenstein, in September 2000. But, again, the law in this Circuit is clear: we do not require the actual mailing, or for that matter the aiding and abetting of

2133

U.S. v. WARD

a specific mailing, in a mail fraud case. Rather, the government must show, beyond a reasonable doubt, that one participant in a fraudulent scheme knowingly caused the use of the mails in furtherance of the scheme, and that the defendant knowingly participated in the scheme or artifice to defraud. See *Funt*, 896 F.2d at 1294. Indeed, Ward acknowledges that there is more than enough evidence here that Pipher, Ward's co-schemer, knowingly caused the mailing of the promissory note listed in Count Two. Moreover, the evidence shows that the mails were utilized repeatedly by CEC, Ward and Pipher, and that the mailing of the collateralized promissory note by Pipher in September of 2000 was altogether foreseeable to the defendant. The law requires no more.

### D. Sufficiency—Count Three

As for Count Three, the record contradicts Ward's claim that the evidence concerning his participation in wire fraud was insufficient. The record is replete with evidence showing that Ward acted as a *principal* in causing the Johnses' wire transfer of $45,000 on April 24, 2000, from Florida to California.

To begin with, Ward was the primary contact for Randy and Ellen Johns when they first invested in CEC. When Randy Johns first saw the CEC newspaper advertisement, it was Ward who answered his initial phone inquiries and promised him that his investments in CEC would yield a remarkable annual interest rate of 45% or a monthly interest rate of 3.75%. It was the defendant Ward who convinced Randy Johns to fly to California to meet with him and Pipher. And it was Ward whom Ellen Johns contacted when the interest payments ceased to arrive in the mail after October 2001. In light of this involvement in the Johnses' investments in CEC, there was more than enough evidence to allow a jury to find that

Ward in fact "caused" Ellen Johns to make the wire transfer on April 24, 2000. But, again, even if Ward had not caused the particular wire transfer, under our law he would still be liable for the wire fraud. Moreover, the wires were repeatedly used in the course of business by CEC, Ward and Pipher, and, undeniably, it was foreseeable that the wires would be used. See *Pereira*, 347 U.S. at 8–9, 74 S.Ct. 358.

### E. Sufficiency—Count Four

Finally, Count Four alleged that Ward "[o]n or about January 7, 2002 . . . cause[d] to be mailed a matter to be delivered by a private or commercial interstate carrier, Federal Express, CEC investment documents, to Larry Baldwin." Again, while it was unnecessary for the government to show that Ward actually caused the specific mailing because of his knowing involvement in the scheme to defraud, in fact the evidence supports the government's claim that Ward did cause this mailing. Ward's signed confession to FBI Agent Michael DeLeon on May 1, 2002, admitted his participation in this mailing:

> In furtherance of the continuing efforts to raise capital for CEC, the attached airbill dated 7 January, 2002, was used to send a client/lender contract/agreement for the purpose of receipting [sic] funds to be used to pay other investors. At the time *I sent this* I knew investors' funds would not be utilized as promised.
>
> Signed, Artemus Ward.

Gov. Ex. 21 (emphasis added). Moreover, the Federal Express air bill shows that a package was sent from Ward to Baldwin on January 7, 2002. Both the admission and the Federal Express air bill were admitted at trial. Quite simply, the evidence was suffi-

cient to sustain the jury's verdict on each substantive count.

## III.

Ward next argues that the district court "constructively amended" the indictment by instructing the jury that it could convict Ward on the mail and wire fraud charges even if it could not reach a verdict on the conspiracy charge. Ward says that because the substantive counts specifically referenced the conspiracy charge enumerated in Count One, the district court's response amounted to a constructive amendment in violation of the Fifth Amendment's Due Process Clause. Again, we disagree.

[7-9] "The Fifth Amendment to the Constitution provides that 'no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ....' A fundamental principle stemming from this amendment is that a defendant can only be convicted for a crime charged in the indictment. It would be fundamentally unfair to convict a defendant on charges of which he had no notice." *United States v. Keller,* 916 F.2d 628, 632–33 (11th Cir.1990). These Fifth Amendment concerns would be implicated if, for example, an indictment were amended so that a defendant was convicted of charges not included in the indictment. Thus, we consider an indictment to be constructively amended "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Narog,* 372 F.3d 1243, 1247 (11th Cir.2004) (quoting *Keller,* 916 F.2d at 634). An amendment, however, must be distinguished from a variance. "A variance occurs when the facts proved at trial deviate from the facts contained in the indict-

ment but the essential elements of the offense are the same." *Keller,* 916 F.2d at 634; *see also United States v. Flynt,* 15 F.3d 1002, 1005–06 (11th Cir.1994). Whereas a variance requires reversal only when the defendant can establish that his rights were substantially prejudiced, constructive amendment of the indictment is *per se* reversible error. *Keller,* 916 F.2d at 633.

[10] In the indictment in this case, all three of the substantive counts alleged that Ward or Pipher, "for the purpose of executing the aforementioned conspiracy to defraud, *and for obtaining money and property by means of false pretenses, representations and promises, did knowingly*" use the mails or wires (emphasis added). Moreover, each count was prefaced by language indicating that all of the allegations in the preceding conspiracy count were realleged and incorporated by reference. After the jury was unable to reach a verdict on the conspiracy count and sent a note to the judge asking, "If we can't come to an agreement on Count One, can we find guilt or innocence on Counts Two, Three and Four?," the district court responded by telling the jury to continue deliberating on the conspiracy count and that the jury "may find the defendant guilty of Count Two, Three and/or Four without finding him guilty of conspiracy if you unanimously find that the conduct involved there was for the purpose of obtaining money and property by means of false pretenses."

The substantive offenses of mail and wire fraud are distinct from the offense of conspiracy. *See Funt,* 896 F.2d at 1294 n. 4 ("Conspiracy and mail fraud are not the same offense, and the fact that [the defendant] was acquitted of conspiracy is not inconsistent with his being a member of a more limited mail fraud scheme."). But Ward argues that because the language of the indictment add-

2135                            U.S. v. WARD

ed the words, "for the purpose of executing the aforementioned conspiracy to defraud" to the requirement that the mail or wire was used "for obtaining money and property by means of false pretenses, representations and promises," the allegata effectively made the conspiracy a necessary part of the substantive offenses, and the district court wrongfully amended the charges. We disagree.

[11]  Ward has conflated wholly unnecessary surplusage that referenced the conspiracy with the essential substantive charges contained in Counts Two, Three, and Four. As the Supreme Court held in *United States v. Miller*, 471 U.S. 130, 140, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), and as we acknowledged in *United States v. Cancelliere*, 69 F.3d 1116, 1121 (11th Cir.1995), surplusage in an indictment may be deleted without any legal error. Indeed, "[a] part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a useless averment that may be ignored." *Miller*, 471 U.S. at 136, 105 S.Ct. 1811 (quotation marks omitted). It is not an amendment to a charge to "drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within [the indictment]." *Id.* at 144, 105 S.Ct. 1811. "[W]here an indictment charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury's consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment of the indictment." *Id.* at 145, 105 S.Ct. 1811. The district court's instruction, that if the jury was unable to reach agreement on the conspiracy charge it could still convict on the substantive charges, did not amount to a constructive amendment.

Ward nevertheless cites to two cases in support of his argument, *United States v. Cancelliere*, 69 F.3d 1116 (11th Cir.1995), and *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); both are distinguishable. In *Cancelliere*, we deemed the district court's striking of the word "willfully" from an indictment after the close of evidence to be a "constructive amendment" when the defendant was charged with "knowingly and willfully" committing the offense of money laundering. *Cancelliere*, 69 F.3d at 1121. Although the term "willfully" was included in the charge by mistake and undeniably was not a necessary element of money laundering, a panel of this Court noted that the government had moved the district court to delete the requirement that they prove willfulness after Cancelliere had already prepared and put on a defense based upon good faith. *Id.* In concluding that the redaction impermissibly broadened the scope of the indictment and mandated reversal, we emphasized that the defendant's whole defense rested on his lack of willfulness. *Id.* at 1122. In this case, notably, there was no alteration of the mens rea requirements for mail or wire fraud, or for that matter of any of the elements of the § 1341 or § 1343 charges. Nor does a fair review of this record support the suggestion that the entire thrust of the defense dealt only with the conspiracy charge.

*Stirone* is even less on point. The issue there was "whether [Stirone] was convicted of an offense not charged in the indictment," when the indictment alleged obstruction of sand importation, but the evidence introduced at trial showed interference with steel exportation. *Stirone*, 361 U.S. at 213, 80 S.Ct. 270. The Supreme Court concluded that the offense proved at trial was not fully contained in the indictment because trial evidence had "amended" the indictment by

U.S. v. WARD

broadening the possible bases for conviction from that which appeared in the indictment. *Id.* at 216–17, 80 S.Ct. 270. *Stirone* is markedly different from the case before us. The district court here did not amend the indictment to add a new offense. The substantive offenses of mail and wire fraud were fully contained in the indictment. In fact, the essential language of the mail and wire fraud statutes was tracked in the substantive charges. All of the elements of mail and wire fraud were included in Counts Two, Three, and Four. None was removed by the court's instructions. *See Miller,* 471 U.S. at 140, 105 S.Ct. 1811 ("Miller was tried on an indictment that clearly set out the offense for which he was ultimately convicted. His complaint is not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary."). The mail and wire fraud counts were charged separately from the conspiracy. The fact that the substantive counts referenced the conspiracy in no way undermined Ward's defense or his right to fair notice of the outstanding charges.

### IV.

Finally, Ward argues that the Fifth Amendment, the Sixth Amendment, the Due Process Clause, and the Ex Post Facto Clause of the Constitution require that his

sentence be no higher than the maximum sentence provided for under the sentencing guidelines, since the sentencing guidelines were legally binding on the date Ward committed the substantive crime and the date on which he went to trial. This argument is without merit. Ward concedes that this Court has already flatly rejected this argument. As Ward recognizes, we are bound by our previous decision in *United States v. Duncan,* 400 F.3d 1297, 1306–08 (11th Cir. 2005), *cert. denied,* — U.S. —, 126 S.Ct. 432, 163 L.Ed.2d 329 (2005), which held that there was no ex post facto violation because at the time the defendant committed the offense, "the recognized state of the law looked to the U.S.Code as establishing maximum sentences." *Id.* at 1308; *see also Cargill v. Turpin,* 120 F.3d 1366, 1386 (11th Cir.1997) ("The law of this circuit is 'emphatic' that only the Supreme Court or this court sitting *en banc* can judicially overrule a prior panel decision."). We rejected an identical argument made in *United States v. Thomas,* 446 F.3d 1348, 1353–55 (11th Cir.2006), and again in *United States v. Martinez,* 434 F.3d 1318, 1323–24 (11th Cir.) (per curiam), *cert. denied,* — U.S. —, 126 S.Ct. 2946, 165 L.Ed.2d 976 (2006). Accordingly, we are bound to reject Ward's invitation to reconsider this issue.

AFFIRMED.

U.S. Court of Appeals, Eleventh Circuit—Thomson/West, Saint Paul, Minn.